IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**CARLOS SACANELL,**<br><br>Defendant. | **Civil Action No. 2:24-cv-5839**<br><br>**Jury Trial Demanded** |

**COMPLAINT**

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges as follows against defendant Carlos Sacanell ("Sacanell" or "Defendant"):

**SUMMARY**

1. This action concerns insider trading by Sacanell in the securities of Oak Street Health, Inc. ("Oak Street") based on material nonpublic information he misappropriated from his long-term domestic partner.

2. In early 2023, Sacanell was in a long-term domestic relationship with a senior executive at Oak Street (the "Senior Executive").

3. From in or about January 2023 through in or about February 2023, the Senior Executive shared material nonpublic information with Sacanell in confidence about CVS Health Corporation ("CVS") acquiring Oak Street.

4. The Senior Executive shared this material nonpublic information with Sacanell because the Senior Executive believed—based on prior conversations with Sacanell and the Senior Executive's history of sharing confidences with Sacanell—that he would keep the

information confidential and would not breach the Senior Executive's trust by using it to trade securities.

5. Sacanell nevertheless traded on the basis of this information from the Senior Executive by purchasing Oak Street stock and call option contracts before CVS publicly announced its acquisition of Oak Street.

6. Sacanell's trades resulted in illicit profits of approximately $617,000.

## VIOLATIONS

7. Sacanell violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by engaging in the conduct this Complaint describes.

8. Sacanell will engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object, unless the Court restrains and enjoins him.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)], 21(e) [15 U.S.C. § 78u(e)] and 21A(a) [15 U.S.C. § 78u-1(a)].

10. The Commission seeks a final judgment (a) permanently enjoining Sacanell from violating Section 10(b) of the Exchange Act or Rule 10b-5 thereunder by engaging in the acts, practices, transactions, and courses of business alleged in this Complaint; (b) ordering Sacanell to disgorge ill-gotten gains he received as a result of the violations this Complaint alleges, and to pay prejudgment interest pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Sacanell to pay civil penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-l]; (d) prohibiting Sacanell from serving as an officer or director

of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)] pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e) and 78aa].

12.     Venue is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The Defendant may be found or transacts business in the Eastern District of Pennsylvania, and certain of the acts, practices, transactions and courses of business constituting the violations of the federal securities laws alleged in this Complaint occurred within this District.

## DEFENDANT

13.     **Carlos Sacanell**, age 58, lives in Willow Grove, Pennsylvania.  He has been employed as a senior scientist for a manufacturer of non-prescription healthcare products. Sacanell and the Senior Executive had a domestic relationship from in or about 2010 through early 2024.  Sacanell lived with the Senior Executive at the Senior Executive's home in Swarthmore, Pennsylvania during the relevant time period.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

14.     The **Senior Executive** was an officer of Oak Street who served on Oak Street's executive committee at times relevant to the Commission's allegations, including the period between January 2023 and February 2023.  The Senior Executive had access to material nonpublic information regarding CVS's acquisition of Oak Street by virtue of the Senior Executive's position and responsibilities.

15. **Oak Street** was a Delaware corporation headquartered in Chicago, Illinois. Oak Street was registered with the Commission pursuant to Section 12(b) of the Exchange Act. Its stock and options traded on the New York Stock Exchange under the ticker "OSH" prior to the company's acquisition by CVS.

16. **CVS** is a Delaware corporation headquartered in Woonsocket, Rhode Island. CVS is registered with the Commission pursuant to Section 12(b) of the Exchange Act. Its stock trades on the New York Stock Exchange under the ticker "CVS."

## COMMONLY USED TRADING TERMS

17. A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) prior to the expiration date. Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

18. A "call" option gives its purchaser-holder the right, but not the obligation, to purchase a security at a specified strike price within a specified period. A call option buyer generally anticipates that the price of the underlying security will increase during that period.

## FACTS

**I.  Sacanell Learned Material Nonpublic Information From The Senior Executive**

19. During the course of their relationship, the Senior Executive shared information in confidence with Sacanell, including information about the Senior Executive's work at Oak Street.

20. The Senior Executive trusted Sacanell to keep this information confidential.

21. The Senior Executive trusted Sacanell not to trade on this information.

4

22. Sacanell knew that the Senior Executive trusted him to keep this information confidential and not to trade on it.

23. At various times throughout the Senior Executive's tenure at Oak Street, the Senior Executive and Sacanell discussed—and Sacanell indicated his understanding and agreement— that, because the Senior Executive shared material nonpublic information about Oak Street with Sacanell, Sacanell should keep the information confidential and should not trade Oak Street stock.

24. On or about January 9, 2023, the Senior Executive learned from another officer of Oak Street that CVS and Oak Street were discussing a potential transaction through which CVS would acquire Oak Street (the "CVS/Oak Street Transaction"). Among other things, the Senior Executive learned the approximate price of the proposed acquisition, and that the transaction would be announced on or about January 23, 2023.

25. The Oak Street officer who told the Senior Executive about the CVS/Oak Street Transaction also told the Senior Executive that only certain Oak Street employees knew or were authorized to know about the transaction. This Oak Street officer further instructed the Senior Executive not to share any information about the deal with any other Oak Street employees.

26. Shortly thereafter, on or about January 9, 2023, the Senior Executive shared this information about the CVS/Oak Street Transaction with Sacanell in private and confidential communications between the Senior Executive and Sacanell.

27. The same day, on or about January 9, 2023, a media outlet reported that CVS was considering acquiring Oak Street. This reporting cited anonymous sources. Neither CVS nor Oak Street confirmed at that time that they were discussing an acquisition of Oak Street by CVS.

28.     The Senior Executive's conversations with Sacanell about the CVS/Oak Street Transaction, however, confirmed that the rumors the media outlet had reported were true.

29.     On or about January 9, 2023 and January 10, 2023, the Senior Executive's coworkers asked the Senior Executive questions about the potential transaction the media outlet had reported.

30.     The Senior Executive in turn communicated in confidence with Sacanell about these conversations and the Senior Executive's obligation to keep information about the CVS/Oak Street Transaction secret from even the Senior Executive's coworkers. Sacanell gave advice to the Senior Executive on how to respond to the Senior Executive's co-workers.

31.     For example, on or about January 9, 2023, the Senior Executive sent Sacanell a text message stating that it was "very uncomfortable having information I can't share." Sacanell responded via text message that the Senior Executive should tell inquiring coworkers "you don't know" about the transaction. He wrote in a later text message that the Senior Executive should be careful about what the Senior Executive said to a coworker who was not authorized to know about the CVS/Oak Street Transaction.

## II.   Sacanell Traded Based On The Material Nonpublic Information He Obtained From The Senior Executive

32.     On or about January 11, 2023, Sacanell began using the confidential information about the CVS/Oak Street Transaction he learned from the Senior Executive for his own benefit.

33.     Between on or about January 11, 2023 and on or about January 20, 2023, Sacanell purchased Oak Street shares and call option contracts. These included over 28,000 Oak Street shares and over 190 Oak Street call option contracts, with a total cost exceeding $870,000.

34.     In the prior two years, Sacanell had rarely traded options and had not traded any Oak Street securities.

### III. Sacanell Obtained And Used Additional Material Nonpublic Information

35. On or about January 20, 2023, the Senior Executive learned that CVS had concerns about moving forward with the CVS/Oak Street Transaction before the Centers for Medicare & Medicaid Services ("CMS") published the Medicare Advantage Risk Adjustment Data Validation Program Final Rule (the "RADV Final Rule").

36. Pending CMS's publication of the RADV Final Rule, there was uncertainty as to how or whether the terms of the RADV Final Rule might impact companies such as Oak Street, which provided health care to Medicare enrollees.

37. The Senior Executive shared in confidence with Sacanell that the CVS/Oak Street Transaction was delayed beyond its expected January 23, 2023 announcement date.

38. After learning this material nonpublic information from the Senior Executive, starting on January 23, 2023 and continuing to January 26, 2023, Sacanell sold most of the Oak Street shares he had purchased just days before. He meanwhile bought eleven Oak Street call option contracts on January 23, 2023 and thirty Oak Street call option contracts on January 26, 2023, all with an expiration date of February 17, 2023.

39. On January 31, 2023, CMS published the RADV Final Rule.

40. On February 1, 2023, Sacanell communicated with the Senior Executive by text message about the RADV Final Rule's impact on the CVS/Oak Street Transaction. The Senior Executive told Sacanell, among other things, that the "ruling was not as harsh as it might have been."

41. About ten minutes after discussing the RADV Final Rule with the Senior Executive, Sacanell began purchasing Oak Street shares and call option contracts. Specifically, on February 1, 2023, Sacanell purchased 5,000 Oak Street shares and 130 Oak Street call option contracts at a cost of over $160,000.

42. On February 2, 2023, Oak Street's Chief Executive Officer emailed members of Oak Street's executive committee—including the Senior Executive—that the CVS/Oak Street Transaction was moving forward, and that Oak Street and CVS would announce it publicly on February 8, 2023.

43. The Senior Executive and Sacanell were in New York City together when the Senior Executive received this email.

44. The Senior Executive shared this information with Sacanell.

45. On February 3, 2023, following his communications with the Senior Executive about the upcoming announcement of the CVS/Oak Street Transaction, Sacanell sold more than $500,000 of other securities. He used these funds to purchase over $500,000 of Oak Street securities throughout the day on February 3, 2023, including 17,300 Oak Street shares and 950 Oak Street call option contracts, all with a February 17, 2023 expiration date.

46. Sacanell was the market's largest trader of Oak Street options on February 3, 2023.

47. When markets closed on February 3, 2023, Sacanell held 26,680 shares of Oak Street stock and 1,313 Oak Street call option contracts, all with a February 17, 2023 expiration date.

48. At that time, Sacanell owned more Oak Street call option contracts than any other retail investor. Indeed, Sacanell's holdings of Oak Street call option contracts were the fifth largest of any investor, including all institutional investors.

49. After markets closed on February 6, 2023, a media outlet reported that CVS was nearing a deal to acquire Oak Street for $39 per share.

50. Oak Street's stock rose nearly thirty percent on February 7, 2023 following the media outlet's report about the potential acquisition. Specifically, Oak Street shares closed at $33.68 per share on February 7, 2023, compared to a $25.96 closing price on February 6, 2023.

51. On February 8, 2023, CVS and Oak Street issued a press release announcing CVS's agreement to acquire Oak Street for $39 per share. Oak Street's stock closed that day at $35.23 per share.

52. On February 10, 2023, Sacanell sold the Oak Street call option contracts he had acquired before CVS and Oak Street announced their agreement. His illicit profit on these call option contracts exceeded $404,000.

53. Sacanell meanwhile continued to trade Oak Street stock into April of 2023.

54. Based on the February 8, 2023 closing price of $35.23 per share (i.e., the closing price on the day Oak Street and CVS announced the CVS/Oak Street Transaction), Sacanell obtained illicit profits of approximately $212,000 on the shares he acquired prior to the public announcement of the CVS/Oak Street Transaction.

55. In total, Sacanell obtained illicit profits of approximately $617,000 through the stock and options trading he undertook based on material nonpublic information he obtained from the Senior Executive in advance of the February 8, 2023 announcement that CVS would acquire Oak Street.

**IV.  Sacanell Violated Federal Securities Laws**

56. The Senior Executive's information concerning the CVS/Oak Street Transaction was material and nonpublic. A reasonable investor would have viewed this information as important to their investment decision and as significantly altering the total mix of information available to the public.

57. Sacanell owed a duty of trust and confidence to the Senior Executive based on their agreement that Sacanell would not disclose, or trade based on, confidential information that the Senior Executive shared with him.

58. Sacannell owed a duty of trust and confidence to the Senior Executive based on their relationship, which included a history, pattern, and practice of sharing confidences.

59. Sacanell knew, was reckless in not knowing, or consciously avoided knowing that the information that the Senior Executive shared with him about the CVS/Oak Street Transaction was material and nonpublic.

60. Sacanell also knew, was reckless in not knowing, or consciously avoided knowing that, based on their history, pattern, and practice of sharing confidences, the Senior Executive expected that Sacanell would maintain the confidentiality of information related to the Senior Executive's work at Oak Street, and not trade on it or use it for his personal benefit.

61. Sacanell purchased Oak Street securities while aware and on the basis of material nonpublic information concerning the CVS/Oak Street Transaction, and in breach of his duty of trust and confidence to the Senior Executive.

62. Sacanell directly or indirectly made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

## CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

63. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-62.

64. By engaging in the conduct described above, Defendant, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

65. By reason of the foregoing, Defendant violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendant from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Prohibiting Defendant from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**III.**

Ordering Defendant to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**IV.**

Ordering Defendant to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

## V.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Respectfully submitted,

Dated:  October 31, 2024

s/ Spencer Willig
Joseph G. Sansone
Scott A. Thompson
Julia C. Green
Gregory R. Bockin
Norman P. Ostrove
Spencer Willig (N.Y. Bar No. 4897443)
United States Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3100
WilligS@sec.gov